UNITED STATES DISTRICT COURT
DISTRICT OF RHODE ISLAND

| | | |
|---|---|---|
| CONSERVATION LAW FOUNDATION, INC. | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 16-cv-143 |
| | ) | |
| J & S SCRAP METAL & RECYCLING, INC. | ) | NO JURY TRIAL |
| | ) | |
| Defendant. | ) | |
| | ) | |

**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF AND CIVIL
PENALTIES**

Plaintiff Conservation Law Foundation, Inc. ("CLF"), by and through its counsel, hereby alleges:

**I. INTRODUCTION**

1.    This is a civil suit brought under the citizen suit enforcement provisions of the Federal Water Pollution Control Act, 33 U.S.C. § 1251, *et seq.* (the "Clean Water Act," "the Act," or "CWA").  Defendant J & S Scrap Metal & Recycling, Inc. ("J & S Scrap") has violated the Clean Water Act through its continuous and ongoing unauthorized discharges of polluted stormwater runoff directly associated with a scrap metal salvage and recycling facility located at 36 Starr Street, Johnston, RI 02919 ("the Facility"), to the waters of the United States without a permit, in violation of 33 U.S.C. §§ 1311(a) and 1342(p)(2)(B), and through its failure to comply with the Rhode Island Pollutant Discharge Elimination System ("RIPDES") Multi-Sector General Permit for Storm Water Discharges Associated with Industrial Activity ("MSGP").  Plaintiff seeks a declaratory judgment, injunctive relief, civil penalties, and other relief the Court deems appropriate to correct these violations.

2.     Section 301(a) of the Clean Water Act makes "the discharge of any pollutant by any person . . . unlawful" except when in conformance with enumerated statutory provisions, including the requirement that a discharger obtain and comply with a National Pollutant Discharge Elimination System ("NPDES") permit under section 402 of the Act. *See* 33 U.S.C. §§ 1311(a), 1342.

3.     The Rhode Island Department of Environmental Management ("RIDEM"), under authority delegated to it by the United States Environmental Protection Agency ("EPA"), established the Rhode Island Pollutant Discharge Elimination System permit to regulate and reduce the impacts of stormwater pollution associated with industrial activities. RIDEM's primary RIPDES regulatory tool is the Multi-Sector General Permit, although a discharger may instead seek coverage under an individual RIPDES permit.

4.     The Defendant has operated and continues to operate a scrap metal salvage and recycling facility on 36 Starr Street, Johnston, RI 02919 since at least 2001, and engages in industrial activities at the Facility including but not limited to the purchase, collection, processing, storage, and shipping of scrap metal, and the operation, maintenance, and storage of industrial equipment.

5.     The Defendant's industrial activities are within the categories of industrial activity subject to the Multi-Sector General Permit and generate stormwater pollution that is collected, channeled, and conveyed into Simmons Brook (Waterbody ID RI0006018R-04), a water of the United States.

6.     The Defendant's past and ongoing discharges of stormwater associated with industrial activity have at no time been authorized under either an individual RIPDES permit or the applicable Multi-Sector General Permits.

7. The Defendant has operated and continues to operate its facility in violation of the Clean Water Act.

## II. JURISDICTION AND VENUE

8. This is a civil suit brought under the citizen suit enforcement provisions of the Federal Water Pollution Control Act, 33 U.S.C. § 1251 *et seq.* (the "Clean Water Act," "the Act," or "CWA"). This Court has subject matter jurisdiction over the parties and this action pursuant to the Clean Water Act section 505(a)(1), 33 U.S.C. § 1365(a)(1), and 28 U.S.C. § 1331 (an action arising under the Constitution and laws of the United States).

9. On January 21, 2016, Plaintiff CLF notified the Defendant of CLF's intention to file suit for violations of the Clean Water Act, in compliance with the statutory notice requirements under section 505(a)(1) of the Act, 33 U.S.C. § 1365(a)(1), and the corresponding regulations at 40 C.F.R. § 135.2(a)(1). A true and correct copy of CLF's January 21, 2016 Notice Letter is attached hereto as Exhibit A.

10. More than sixty days have passed since the Notice Letter was served on the Defendant, during which time neither the EPA nor the State of Rhode Island has commenced the diligent prosecution of a court action to redress the violations alleged in this complaint. 33 U.S.C. § 1365(b)(1)(B).

11. Venue is proper in the U.S. District Court for the District of Rhode Island pursuant to section 505(c)(1) of the Clean Water Act, 33 U.S.C. § 1365(c)(1), because the source of the violations is located within this judicial district.

## III. PARTIES

12. Plaintiff Conservation Law Foundation, Inc. ("CLF") if a nonprofit, member-supported organization incorporated under the laws of Massachusetts with an office at 55 Dorrance

Street, Providence, Rhode Island, 02903 and a principal place of business at 62 Summer Street, Boston, Massachusetts, 02110. CLF is a regional organization with more than 4,000 members throughout New England, including approximately 200 members in Rhode Island. CLF is dedicated to protecting New England's environment for the benefit of all people. CLF has a long history of working to protect the health of New England and Rhode Island's waterways, including addressing the significant water quality impacts of stormwater pollution. Members of CLF live on or near the Pawtuxet River and use and enjoy the Narragansett Watershed for, among other things, fishing, recreation, boating, scenic and aesthetic enjoyment, and scientific purposes. CLF actively seeks federal and state agency implementation of the Clean Water Act, and where necessary, directly initiates enforcement actions on behalf of itself and its members.

13. Discharges of pollutants by the Defendant adversely affect CLF members' use and enjoyment of the Narragansett watershed. The interests of CLF's members have been, are being, and will continue to be adversely affected by the Defendant's failure to comply with the Clean Water Act and the Multi-Sector General Permit. The relief sought will redress these harms. The unlawful acts and omissions described herein have and will continue to irreparably harm Plaintiff's members, for which harm they have no plain, speedy, or adequate remedy at law.

14. The Defendant is a corporation organized under the laws of the State of Rhode Island, and maintains, operates, and is responsible for industrial activities at the Facility.

## IV. STATUTORY BACKGROUND

### The Clean Water Act

15.     Section 301(a) of the Clean Water Act, 33 U.S.C. § 1311(a), strictly prohibits the discharge of any pollutant into waters of the United States from a "point source," unless the discharge complies with various enumerated sections of the Act.  Among other things, section 301(a) prohibits discharges in violation of, or not authorized by, the terms of a valid permit issued pursuant to section 402(p) of the Clean Water Act, 33 U.S.C. § 1342(p).

16.     Section 502(14) of the Clean Water Act broadly defines "point source" as including "any discernible, confined, and discrete conveyance, including but not limited to any pipe, ditch, channel, tunnel, conduit, well, discrete fissure, container, rolling stock, concentrated animal feeding operation, or vessel or other floating craft, from which pollutants are or may be discharged." *See* 33 U.S.C. § 1362(14).  The regulations which implement the Clean Water Act define "discharge of a pollutant" as including "additions of pollutants into waters of the United States from: surface runoff which is collected or channelled [sic] by man[.]" 40 C.F.R. § 122.2.

17.     Congress amended the Clean Water Act in 1987 to require that certain industrial facilities obtain stormwater discharge permits.  Water Quality Act of 1987, Pub. L. No. 100-4, § 405, 101 Stat 7 (1987); *see* 55 Fed. Reg. 47990, 47991-93 (Nov. 16, 1990).  Accordingly, section 402 of the Act directed the EPA to develop a phased approach for regulating stormwater discharges under the National Pollutant Discharge Elimination System ("NPDES") permitting program.  CWA §§ 402(a)(1), 402(p)(2), 402(p)(3)(A), 402(p)(4), 402(p)(6); 33 U.S.C. §§ 1342(a)(1), 1342(p)(2), 1342(p)(3)(A), 1342(p)(4), 1342(p)(6).

18.    In 1990, in furtherance of the requirements of the Clean Water Act section 402, EPA promulgated regulations, set forth at 40 C.F.R. § 122.26, requiring industrial dischargers to submit applications for permit coverage no later than October 1, 1992. In establishing these regulations, EPA cited abundant data showing the harmful effects of stormwater runoff on rivers, streams, and coastal areas across the nation.  In particular, EPA found that runoff from industrial facilities contained elevated pollution levels. 55 Fed. Reg. 47990, 47991 (Nov. 16. 1990).

19.     The EPA has delegated authority to the State of Rhode Island to implement a NPDES permitting program under the Clean Water Act.

20.     RIDEM has issued a Multi-Sector General Permit for industrial sources of polluted stormwater runoff under the Rhode Island Pollutant Discharge Elimination System.

21.    In October 2005, RIDEM issued an MSGP with an effective date of May 1, 2006, requiring all covered facilities to file a Notice of Intent ("NOI") for coverage under the Multi-Sector General Permit.

22.    Thereafter, RIDEM issued an MSGP with an effective date of August 15, 2013, requiring all covered facilities to file an NOI.

23.    In order to discharge stormwater lawfully, industrial dischargers must obtain coverage under the MSGP and comply with its requirements or, alternatively, obtain coverage under an individual RIPDES permit.  Among those requirements, industrial dischargers must develop and implement a Storm Water Management Plan ("SWMP") identifying and controlling sources of pollutants associated with industrial discharges from the subject facility. U.S.C. § 1342(p); MSGP Part I(B)(1)(a) & (B)(3)(F)(2); MSGP Part V; MSGP Part II(A).

24. Section 505(a)(1) the Clean Water Act, 33 U.S.C. § 1365(a)(1), provides for citizen enforcement actions against any "person" who is alleged to be in violation of an "effluent standard or limitation . . . or an order issued by the Administrator or a State with respect to such a standard or limitation."

25. Such enforcement action under the Clean Water Act section 505(a) includes an action seeking remedies for unauthorized discharge under the Act section 301, 33 U.S.C. § 1311, as well as for violation of a permit condition under CWA section 402, 33 U.S.C. § 1342 and section 505 (f), 33 U.S.C. § 1365(f).

26. Each separate violation of the Clean Water Act subjects the violator to a penalty of up to $32,500 per day for each violation that occurred between March 15, 2004 and January 12, 2009, and up to $37,500 per day for each violation that occurred after January 12, 2009. *See* CWA § 309(d) and § 505(a) and (d), 33 U.S.C. §§ 1319(d), 1365(a) and (d); 40 C.F.R. §§ 19.1-19.4.

## V. FACTS

27. Since at least 2001, the Defendant has operated, and continues to operate, a scrap metal salvage and recycling facility located at 36 Starr Street, Johnston, RI 02919.

28. The industrial activity at the Facility falls under Standard Industrial Classification ("SIC") Code 5093, the listed codes in Appendix B of the Multi-Sector General Permit, and/or the activities listed in 40 C.F.R. § 122.26(b)(14)(vi). Because the Facility has a primary SIC Code of 5093 and discharges stormwater associated with industrial activity, J & S Scrap is required to apply for, obtain coverage, and comply with the requirements of a discharge permit such as the MSGP.

29.   The Defendant has stored uncovered scrap metal in storage areas upgrade of Simmons Brook.  An aerial image of the Defendant's Facility showing its proximity to Simmons Brook is attached as Exhibit B.

30.   The Defendant has engaged and continues to engage in the following industrial activities at the Facility: the purchase, collection, processing, and storage of scrap metal outdoors.

31.   Upon information and belief, the sources of pollutants associated with the industrial activities at the Facility include: material and equipment left outdoors; vehicles driving on and off the Facility; aboveground storage tanks; material processing areas; and channels, ditches, discrete fissures, containers, and other conveyances to waters of the United States.

32.   Areas of industrial activity at the Facility have been exposed to precipitation and snowmelt.

33.   Rain and snowmelt in contact with areas of industrial activity on the Facility become contaminated with the pollutants associated with the Defendant's industrial activity. Precipitation falls on and flows over the Facility, picking up pollutants associated with the Facility's operations.  Upon information and belief, pollutants present in stormwater discharged from the Facility include, but are not limited to: oil and grease; heavy metals including copper, lead, and mercury; aluminum; petroleum hydrocarbons; and suspended solids.

34.   The resulting stormwater associated with industrial activity then flows via site grading, ditches, swales, berms, the operation of gravity, direct hydrological connections through the ground, and other collections and conveyances into Simmons Brook.

35. EPA considers rainfall above 0.1 inches during a 24-hour period a measurable amount. 40 C.F.R. § 122.26(c)(i)(E)(6).

36. The MSGP specifically references snow and snowmelt as a form of stormwater discharge that must be addressed by a discharger in its control measures. MSGP II(A)(2)(a).

37. During every measurable rainfall and every instance of snowmelt, water flows onto and over exposed materials and accumulated pollutants at the Facility, discharging stormwater runoff associated with the Defendant's industrial activity into Simmons Brook (Waterbody ID RI0006018R-04) at multiple points throughout its length. Downstream of discharge points associated with J & S Scrap, Simmons Brook flows into the Pocasset River (Waterbody ID RI0006018R-03A), which thereafter flows into the Pawtuxet River (Waterbody ID RI0006017R-03), and then into other water bodies located within the Narragansett watershed.

38. Simmons Brook, the Pocasset River, the Pawtuxet River, and other bodies located within the Narragansett watershed are "waters of the United States," as defined in 40 C.F.R. § 122.2, and therefore, "navigable waters," as defined in 33 U.S.C. § 1362(7).

39. The Environmental Protection Agency ("EPA") has designated Simmons Brook as impaired pursuant to Section 303(d) of the Act, 33 U.S.C. § 1313(d), for failure to meet minimum water quality standards.  The Simmons Brook is impaired for impaired biota (namely benthic macroinvertebrates) and pathogens (namely enterococcus bacteria). Stormwater, municipal discharges and sewage, and urban-related runoff have been identified as probable sources of impairments in Simmons Brook.

40. The Pocasset River is impaired pursuant to Section 303(d) of the Act, 33 U.S.C. § 1313(d), for failure to meet minimum water quality standards. The Pocasset River is

impaired for chloride, copper, impaired biota (namely benthic macroinvertebrates), and pathogens (namely enterococcus bacteria).

41. EPA has designated the Pawtuxet River as impaired pursuant to Section 303(d) of the Act, 33 U.S.C. § 1313(d), for failure to meet minimum water quality standards. The Pawtuxet River is impaired for impaired biota (namely benthic macroinvertebrates), cadmium, nutrients, mercury, and pathogens (namely enterococcus bacteria).

42. Upon information and belief, stormwater runoff from the Facility is not treated to remove the pollutants referenced above before it is discharged into Simmons Brook.

43. Upon information and belief, the Defendant has not obtained authorization to discharge stormwater under the Multi-Sector General Permit, or any other valid authorization for the Facility.

## VI. CLAIMS FOR RELIEF

### First Cause of Action: Unauthorized Discharge of Pollutants Into Waters of the United States

44. Plaintiff incorporates the allegations contained in the above paragraphs as though fully set forth herein.

45. Section 301 (a) of the Clean Water Act, 33 U.S.C. § 1311(a), prohibits the discharge of any pollutant from any point source into waters of the United States, except for discharges in compliance with the requirements of a permit issued pursuant to the Clean Water Act section 402(p), 33 U.S.C. § 1342(p).

46. In order to be authorized to discharge lawfully under the Multi-Sector General Permit, an industrial discharger's facility must meet requirements set forth in Part I of the Multi-Sector General Permit.  These requirements include, but are not limited to:

   (a) establishing eligibility for coverage under the permit

(b) selecting, designing, installing, and implementing control measures in accordance with Multi-Sector General Permit Part II(A);

(c) developing a complete and accurate Stormwater Management Plan in accordance with the permit's requirements; and

(d) filing a complete and accurate Notice of Intent to seek coverage under the permit.

47. The Defendant is required to obtain permit coverage for its Facility and comply with the Multi-Sector General Permit pursuant to section 402 of the Clean Water Act, 33 U.S.C. § 1342.

48. The Defendant's industrial activities at the Facility have resulted and continue to result in "stormwater discharge associated with an industrial activity" within the meaning of 40 C.F.R. § 122.26(b)(14) into Simmons Brook and downstream receiving waters on every day of precipitation greater than 0.1 inches and every instance of snowmelt.

49. The Defendant's discharges of stormwater associated with industrial activity ("industrial stormwater discharges") are discharges of pollutants within the meaning of 33 U.S.C. § 1362(12).

50. The Defendant's industrial stormwater discharges at the Facility are point source discharges into waters of the United States in violation of the Clean Water Act section 301(a), 33 U.S.C. § 1311(a).

51. Since at least 2001, the Defendant has discharged and continues to discharge industrial stormwater without authorization under a valid RIPDES permit as required by the Clean Water Act section 301(a), 33 U.S.C. § 1311(a) and section 402(p)(2)(B), 33 U.S.C. 1342(p)(2)(B).

52. Each and every day since at least 2001, on which the Defendant has discharged and continues to discharge industrial stormwater from the Facility without authorization under a valid RIPDES permit constitutes a distinct violation of the Clean Water Act section 301(a), 33 U.S.C. § 1311(a) and section 402, 33 U.S.C. § 1342.

**Second Cause of Action: Failure to Obtain a Permit for Industrial Stormwater Discharges**

53. Plaintiff incorporates the allegations contained in the above paragraphs as though fully set forth herein.

54. The Defendant has been required to obtain permit coverage for its industrial stormwater discharges under each of the Multi-Sector General Permits issued by RIDEM, including the Multi-Sector General Permit effective August 15, 2013, or by seeking and obtaining an individual RIPDES permit pursuant to section 402 of the Clean Water Act, 33 U.S.C. § 1342.

55. The Defendant has failed, and continues to fail, to obtain permit coverage under the Multi-Sector General Permit effective August 15, 2013, or any other iteration of the MSGP, or an individual RIPDES permit for its facility.

56. Each and every day on which the Defendant has not had permit coverage for its Facility under the Rhode Island Pollutant Discharge Elimination System is a separate and distinct violation of the Clean Water Act section 301(a), 33 U.S.C. § 1311(a) and section 402, 33 U.S.C. § 1342.

**Third Cause of Action: Failure to Comply with a Permit for Industrial Stormwater Discharges**

57. Plaintiff incorporates the allegations contained in the above paragraphs as though fully set forth herein.

58. Industrial dischargers are required, at a minimum, to comply with the requirements of the Multi-Sector General Permit, which include but are not limited to:

    (a) developing and implementing a complete and accurate Stormwater Management Plan, which must include, but is not limited to, the following: information related to a company stormwater pollution prevention team, a site description and general location map, a summary of pollutant sources, a description of control measures, and schedules and procedures pertaining to control measures and monitoring (Multi-Sector General Permit Part V);

    (b) submitting a complete Notice of Intent ("NOI") to the Director of the Rhode Island Department of Environmental Management to be covered by the Multi-Sector General Permit, accompanied by a complete and accurate Stormwater Management Plan (Multi-Sector General Permit Part I(C)(1)(a));

    (c) implementing required stormwater control measures in accordance with good engineering practices and manufacturer's specifications in order to prevent polluted stormwater discharges from reaching nearby waterbodies (Multi-Sector General Permit Part II(A));

    (d) conducting facility inspections by qualified personnel (Multi-Sector General Permit Part IV(A));

    (e) collecting and analyzing stormwater samples from each outfall at the Facility and inspecting the same for indicators of pollution (Multi-Sector General Permit Parts VI(B), (A)(1), (A)(3));

    (f) conducting annual comprehensive site inspections and submitting the results thereof to RIDEM (Multi-Sector General Permit Parts VII(A), (B));

(g) complying with the required benchmark monitoring and sampling procedures (Multi-Sector General Permit Part VI(B));

(h) monitoring for all pollutants for which a receiving waterbody is impaired and for which a standard analytical method exits (Multi-Sector General Permit Part VI);

(i) complying with reporting and recordkeeping requirements (Multi-Sector General Permit Part VII); and

(j) satisfying sector-specific requirements such as, in the case of the Defendant's Facility, requirements pertaining specifically to scrap metal facilities (Multi-Sector General Permit Part VIII Subpart N).

59. The Defendant has failed, and continues to fail, to comply with the full requirements of the Multi-Sector General Permit.

60. Each and every day on which the Defendant has failed to comply with the Multi-Sector General Permit is a separate and distinct violation of the Clean Water Act section 301(a) and 402, 33 U.S.C. § 1311(a), and 33 U.S.C. § 1342.

## VII. RELIEF REQUESTED

61. Wherefore, Plaintiff respectfully requests that this Court grant the following relief:

(a) Declare the Defendant to have violated and to be in violation of section 301(a) of the Clean Water Act, 33 U.S.C. § 1311(a), for its unlawful and unauthorized discharges of pollutants at the Facility;

(b) Declare the Defendant to have violated and to be in violation of section 301 and section 402 of the Clean Water Act, 33 U.S.C. §§ 1311(a), 1342, for its failure to obtain coverage under the Multi-Sector General Permit issued under the Rhode Island Pollutant Discharge Elimination System by the State of Rhode Island;

(c) Declare the Defendant to have violated and to be in violation of section 402 of the Clean Water Act, 33 U.S.C. § 1342, for its failure to comply with all applicable requirements of the Multi-Sector General Permit.

(d) Enjoin the Defendant from discharging pollutants from the Facility and into the surface waters surrounding and downstream from the Facility except as authorized and in compliance with a Rhode Island Pollutant Discharge Elimination System permit;

(e) Order the Defendant to comply fully and immediately with all applicable requirements of the Multi-Sector General Permit for the Facility;

(f) Order the Defendant to pay civil penalties up to $32,500 per day for each violation which occurred between March 15, 2004 and January 12, 2009, and up to $37,500 per day for each violation that occurred after January 12, 2009, for each violation of the Clean Water Act at the Facility pursuant to sections 309(d) and 505(a) of the Clean Water Act, 33 U.S.C. §§ 1319(d), 1365(a) and 40 C.F.R. §§19.1-19.4;

(g) Order the Defendant to take appropriate actions to remedy the harm caused by its noncompliance with the Clean Water Act;

(h) Award Plaintiff's costs (including reasonable investigative, attorney, witness, and consultant fees) as permitted by section 505(d) of the Clean Water Act, 33 U.S.C. § 1365(d); and

(i) Award any such other and further relief as this Court may deem appropriate.

## VIII. NO PRIOR LAWSUITS

CLF has filed no prior related lawsuits against Defendant seeking redress for these violations under the Clean Water Act.

## IX. NO JURY TRIAL DEMAND

Consistent with its right under the Clean Water Act to bring a citizen suit, CLF does not seek a jury trial.

Dated: March 23, 2016

<div style="margin-left:40%">

Respectfully submitted,

CONSERVATION LAW FOUNDATION, INC.

By its attorney:

/s/ Max Greene

Max Greene, RI Bar No. 7921
Conservation Law Foundation
55 Dorrance Street
Providence, RI 02903
(401) 351-1102 x2013
mgreene@clf.org

</div>